PANDOLFI HOUSE OF CARPETS, INC.
on behalf of itself and all others
similarly situated,

                  Plaintiff,

        v.

VITAFOAM, INC., VITAFOAM PRODUCTS
CANADA LIMITED, HICKORY SPRINGS
MANUFACTURING COMPANY, THE
CARPENTER COMPANY, VALLE FOAM
INDUSTRIES, INC., DOMFOAM
INTERNATIONAL, INC., FLEXIBLE FOAM
PRODUCTS, INC., THE WOODBRIDGE
GROUP, FOAMEX INNOVATIONS, INC.,
FUTURE FOAM, INC., SCOTTDEL, INC.

                 Defendants.

**CLASS ACTION COMPLAINT**

Plaintiff, Pandolfi House of Carpets brings this action for damages and injunctive relief for price fixing under Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1, and the antitrust laws of the United States against defendants Vitafoam, Inc., Vitafoam Products Canada Limited, Hickory Springs Manufacturing Company, The Carpenter Company, Valle Foam Industries, Inc., Domfoam International, Inc., Flexible Foam Products, Inc., The Woodbridge Group, Foamex Innovations, Inc., Future Foam, Inc., Scottdel Inc. which are or were selling polyurethane foam in the United States between 1999 and the present. Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.     This case arises out of a conspiracy among Defendants and their Co-Conspirators to raise and fix the prices of polyurethane foam and polyurethane foam products ("polyurethane

foam"). During the Class Period, and earlier, defendants conspired to fix, raise, maintain and/or stabilize prices of polyurethane foam by the means and mechanisms described herein.

2.     This case is brought as a class action on behalf of all persons who, from at least as early as 1999 to the present (hereinafter, the "Class Period"), purchased polyurethane foam, directly from one or more of the Defendants or their co-conspirators.

3.     As alleged herein, defendants explicitly agreed with each other to charge inflated prices for polyurethane foam. Every price increase known during the class period was the result of conspiratorial discussions among defendants to fix prices. Defendants also agreed to allocate customers in specific communications between each other.

4.     As a direct and proximate result of Defendants' unlawful conduct, plaintiff and the members of the Class (defined below) have paid unlawful, artificially inflated prices for polyurethane foam, and therefore, have suffered injury to their businesses and property.

5.     Plaintiff Pandolfi House of Carpets, Inc. purchased polyurethane foam directly from one or more of the Defendants during the Class Period. Plaintiff brings this class action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover damages, the costs of suit, including reasonable attorneys' fees, to enjoin the continuation of the conspiracy, and for such other relief as is afforded under the antitrust laws of the United States for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## PLAINTIFF

6.     Plaintiff Pandolfi House of Carpets, Inc. ("Pandolfi") is a Pennsylvania corporation with its principal place of business located in Springfield, Pennsylvania. During the Class Period, Pandolfi purchased polyurethane foam directly from one or more of the Defendants.

7.      The prices Pandolfi paid to defendants for polyurethane foam was greater than the prices it would have paid absent the conspiracy alleged herein. Pandolfi has therefore been injured in its business and property by reason of defendants' antitrust violations. Pandolfi asserts its claims on behalf of itself and all direct purchasers who, during the Class Period, purchased polyurethane foam from one or more of the Defendants which resulted in injury.

## DEFENDANTS

8.      Vitafoam Inc. ("Vitafoam Inc.") is a privately owned and operated company with its headquarters located a 2215 Shore Drive, High Point, NC 27263.  During the Class Period, Vitafoam Inc. sold polyurethane foam throughout the United States. Collectively, Vitafoam Canada and Vitafoam Inc. are referred to herein as Vitafoam.

9.      Vitafoam, Inc. manufactures plastic netting, automotive products, general trade, and nonwoven products. It produces mattresses and pads, convoluted pads, wheelchair components, and protective packaging for medical supplies, as well as positioning and support wedges, and immobilizing devices, such as neck bracing pillows for the home and commercial healthcare industries.  The company offers polyurethane foam products for packaging, furniture, and upholstery industries; marine industry products, such as fenders, drainable boat seats, waterproof cushions, air circulation pads, and filtration devices; and foam for fabric producers, laminators, trim companies, and original equipment manufacturers in the automotive industry.  It also provides laminating materials, such as fabrics, flexible polyurethane foam, nonwoven webs, films, and other substrates, as well as carpet underlay for residential and commercial sectors. Vitafoam, Inc. also serves medical, marine, technical, bedding, lamination, and carpet underlay industries.

10.      Defendant Vitafoam Products Canada Limited ("Vitafoam Canada") is a privately owned and operated company with its headquarters located at 150 Toro Road, North York,

Ontario M3J 2A9, Canada. During the Class Period, Vitafoam Canada sold polyurethane foam throughout the United States.

11. Vitafoam Canada manufactures all types of flexible polyurethane foam for use in furniture, bedding and automotive applications, including packaging, medical, industrial and a full range of memory foams. It also produces latex mattresses and toppers.

12. Defendant Hickory Springs Manufacturing Company ("Hickory Springs") is a North Carolina corporation with its headquarters located at 235 2nd Avenue, NW, Hickory, NC 28601. During the Class Period, Hickory Springs sold polyurethane foam throughout the United States.

13. Hickory Springs Manufacturing Company is one of the nation's largest integrated components manufacturers and suppliers for the furniture and bedding industries with more than 60 operating facilities in the United States and throughout the world.

14. Defendant The Carpenter Company ("Carpenter") is a privately owned and operated company with its headquarters located at 5016 Monument Avenue, Richmond Virginia, 23230. Carpenter operates from around 30 locations in the United States, 5 locations in Canada and around 20 locations in Europe. During the Class Period, Carpenter sold polyurethane foam throughout the United States.

15. Carpenter is the largest manufacturer of polyurethane foam cushioning in the world. It has divisions on the following areas: air filter media, bedding, carpet cushion, chemicals, chemical systems, consumer products, expanded polystyrene systems, flexible foam packaging furniture, molded manufacturing, polyester fiber, and tire products.

16. Defendant Valle Foam Industries, Inc. ("Valle") is a privately owned and operated corporation with its headquarters located at 4 West Dr., Brampton, ON L6T 2H7.

During the Class Period, Valle directly and/or through its control of its affiliates, sold polyurethane foam throughout the United States.

17. Valle manufactures slab stock polyurethane foams for the furniture, bedding, packaging, carpet and children's toy industries.

18. Defendant Domfoam International, Inc. ("Domfoam") is a subsidiary of Valle Foam Industries, with its headquarters located at 8785 Langelier Blvd., Montreal, Quebec, HIP 2C Canada. During the Class Period Domfoam sold polyurethane foam throughout the United States.

19. Domfoam is a manufacturer/wholesaler of sponge and polyurethane foam. Domfoam provides foam for the following purposes: mattresses, sponge foam blocks, carpet cushion, pillows, bolsters, furniture foam, toppers, anti-static foam, anti-microbial foam, visco-elastic foam, camping foam, and sporting goods.

20. Defendant The Woodbridge Group ("Woodbridge") is a Canadian corporation with its headquarters located at 4240 Sherwoodtowne Blvd., Mississauga, Ontario, L4Z 2G6, Canada. During the Class Period, Woodbridge sold polyurethane foam throughout the United States.

21. Woodbridge's primary focus is supplying foam for automotive components. Woodbridge also supplies other industries including: commercial and recreational transportation, building products, construction, packaging and several consumer and industrial markets.

22. Defendant Flexible Foam Products, Inc. ("Flexible Foam") is a privately owned and operated Ohio company with its headquarters located at 12575 Bailey Road, Spencerville, Ohio 45887 and operations in Texas, Indiana, Florida and Wisconsin. It is a subsidiary of Ohio

5

Decorative Products, Inc., also of Spencerville, Ohio. During the Class Period, Flexible Foam sold polyurethane foam throughout the United States.

23.     Flexible Foam manufactures polyurethane foam and rebond products for customers in the bedding, flooring, furniture, packaging, and automotive industries

24.     Defendant Scottdel Inc. ("Scottdel") is a privately held corporation with its headquarters located at 400 Church Street, Swanton, Ohio 43558. During the Class Period, Scottdel sold polyurethane foam throughout the United States.

25.     Scottdel manufactures a complete line of commercial and residential bonded urethane carpet cushions.

26.     Defendant Foamex Innovations, Inc., formerly known as Foamex International, Inc. ("Foamex"), is a privately owned and operated company with its headquarters located at Rose Tree Corporate Center II, 1400 N. Providence Road, Suite 2000, Media, PA 19063-2076. During the Class Period, Foamex sold polyurethane foam throughout the United States.

27.     Foamex provides foam for the home, healthcare, electronics, industrial, personal care and transportation markets. Its foam is used in automotive cushioning, shipping packages, beds and furniture, as well as personal electronics. Foamex also provides components for filters, dispensers, gaskets and seals in everything from blood oxygenators to computer disk drives.

28.     Defendant Future Foam, Inc. ("Future Foam") is a privately owned and operated company with its headquarters located in 1610 Avenue N, Council Bluffs, IA 51501. During the Class Period, Foamex sold polyurethane foam throughout the United States.

29.     Future Foam produces foam products for bedding, foam blocks, carpet cushion, furniture, and packaging.

<u>**CO-CONSPIRATORS AND AGENTS**</u>

30.     Other natural persons, corporations, and entities not named as defendants herein, have participated in the unlawful conspiratorial activity alleged herein in violation of the antitrust laws of the United States.

31.     Whenever in this Complaint reference is made to a statement, or transaction of any corporation or entity, the allegation means that the corporation or entity acted, stated, or transacted by or through its directors, members, partners, officers, employees, or agents, while they were engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within the scope of their authority.

<u>**JURISDICTION AND VENUE**</u>

32.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and 15 U.S.C. §§15, 26.

33.     Venue is proper in this district pursuant to 28 U.S.C. §§15, 22 and 26 and pursuant to 28 U.S.C. §1391(b), (c) and (d), because at all times relevant to the Complaint, (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this district; (b) a substantial part of plaintiff's claims occurred in this district; (c) a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

34.     This Court has in personam jurisdiction over each of the defendants because, inter alia, each of the defendants:  (a) committed acts in furtherance of the conspiracy alleged herein in this district and directed the unlawful conspiracy through persons and entities located in this district, including fixing the prices of polyurethane foam sold to purchasers in this district; (b) transacted business in polyurethane foam and other products in this district; (c) maintain and have maintained continuous and systemic contacts with this district over a period of years; (d)

7

purposefully availed itself of the benefits of doing business in this district. Accordingly, each of the defendants maintains minimum contacts with this district more than sufficient to subject it to service of process and sufficient to comply with due process of law.

## FACTUAL ALLEGATIONS

**The Polyurethane Foam Market**

35.     Polyurethane foams are used to reduce shock or insulate objects. Specifically, polyurethane foams are used in bedding, carpet cushioning, packaging, seat cushioning, shipping pads and shipping cushioning, car interiors, fluid filtration systems, anti-noise and vibration systems in aircraft, medical devices, and in a number of other consumer applications.

36.     Polyurethane foam refers to different types of foam consisting of polymers made of molecular chains bound together by urethane links. It can be flexible or rigid, but generally has a low density.

37.     Flexible polyurethane foam is most often used in bedding and upholstery, while the more rigid variety is used for products thermal insulation and in automobile dashboards. Microcellular foam may be used to make car steering wheels or line the insides of athletic helmets. Elastomeric foam is typically used to make the outer sole of many types of footwear, including athletic shoes.

38.     There are few acceptable alternatives for polyurethane foam. According to the Polyurethane Foam Association, "comparing [polyurethane foam] to alternative materials in the areas of economics, comfort potential, ease of use, and durability, there is not an acceptable substitute for polyurethane foam."

39.     In 2010, domestic revenue for the polyurethane foam industry is expected to be approximately $12 billion. Furniture and furnishings account for 36.7% of industry revenue. The major products in this segment include pillows, seating, cushioning, mattress cores and quilt

rolls. Transportation products account for 19.1 % of industry revenue. This segment includes foam used for automotive seating, protective cushioning and sound insulation in cars and light trucks. Building and construction account for 12% of industry revenue. Packaging products account for 5.3% of industry revenue. Major packaging products include protective shipping pads and food containers.

40. There has been a recent trend towards consolidation within the industry. Large companies have been active in acquiring smaller companies and other competitors over the course of the last ten years. For example, in 2007, Defendant Carpenter acquired its European competitor, Dumo NV. Carpenter has approximately 16.3% market share in this industry.

41. After its parent corporation was acquired in 2006, Vitafoam Inc. sold one plant to Olympics Product, LLC, a joint venture between Woodbridge and Hickory Springs. It sold another plant to Flexible Foam Products.

42. Defendants alleged here to be participants in the conspiracy are most of the major North American polyurethane foam producers representing a significant portion of the United States market. There are virtually no imports of products in this industry due to the prohibitive freight costs involved in transporting these products over long distances.

**Defendant Vitafoam's Admission of a Conspiracy**

43. In February 2010, Vitafoam voluntarily approached the U.S. Department of Justice, Antitrust Division, to self-report evidence of illegal antitrust activities involving Vitafoam and other companies and individuals in the industry ("competitors") and to seek acceptance into the Antitrust Division's Corporate Leniency Program. Since that time, Vitafoam and its employees have been cooperating with this investigation.

9

44.     As a result of its application, Vitafoam has received a conditional leniency letter from the DOJ's Antitrust Division. This fact, in and of itself, is significant. It means that Vitafoam has admitted to participation in a conspiracy to violate the antitrust laws.

45.     The impetus for the Defendants' conspiratorial conduct was typically increases in their raw material costs. Defendants utilize chemicals, including polyols and toluene diisocyanate (or "TDI") in the manufacturing of polyurethane foam.

46.     When Defendants' raw material suppliers announced price increases for chemical ingredients of foam, such as polyols and TDI, defendants contacted each other. During the communications, the Defendants discussed supporting specific price increases and the timing of announcements regarding an effective date of such increases.

47.     During the Class Period, there was an understanding and agreement among the Defendants to collectively support price increases. This understanding and agreement was reached in actual discussions among competitors about the percentage of price increases, the dates of the increases, and how the conspirators would announce the increases with typically the same effective dates. Price increase announcement letters were then mailed to customers, reflecting the prices determined by the conspirators.

48.     As part of the conduct to coordinate or support price increases, the Defendants instructed their sales people to send copies of their draft price increase letters to their competitors.

49.     Defendants regularly had discussions with each other concerning price increases and the timing of those increases. These discussions involved inquiries as to whether each competitor was going to support the price increase, when the price increases were going to be issued and what the effective dates would be of the increases.

50.     Defendants had discussions on multiple occasions involving price increases concerning shared customers.  In an effort to coordinate their price increases and to make sure those increases went through for the shared customers, the Defendants communicated by phone and sent by fax, copies of draft price increase letters.

51.     During the Class Period, Defendants also agreed to avoid each other's customers and not attempt to take business or market share from one another.

52.     Defendants engaged in this conspiratorial activity by reaching understandings and agreements on price increases with their competitors for the same percentage on the same effective date.  The objective of the price increase scheme was for the conspirators to collectively pass raw material cost increases on to their customers, as well as to maintain their respective market shares.

53.     The Defendants' discussions relating to coordinating price increases among competitors were conducted primarily by means of telephone, electronic mail, and in-person meetings.  In person discussions frequently took place at meetings of the Polyurethane Foam Association ("PFA") trade group.

54.     Defendants took numerous steps to avoid detection of their conspiracy.  At times, full names would not be used in correspondence and instead participants would only using first names or initials.  Conspirators took advantage of attending the PFA meetings along with their competitors and met to discuss coordinating price increases outside of the formal meetings.  Similarly, competitors visited each other's manufacturing facilities for the purported purpose of sharing technological and operational advances, but were actually using the opportunity to discuss coordinated price increases.  Another method to avoid detection involved going to a local

Staples or other office store to use the public facsimile machines to send each other price increase letters without the identifying facsimile transmission banner.

55.     Discussions among competitors in the foam industry included conversations about legitimate topics like business development or potential joint ventures, and then ultimately led to conspiratorial conversations about price increases.  These discussions about coordinating pricing took place during in-person discussions, electronic mail communications, and telephone conversation.  These discussions led to a clear understanding and agreement that after the participants would discuss the price increases and effective dates, they would then implement increases in accordance with that coordination.

56.     Virtually every known price increase, going back to at least 1999 and until Vitafoam's entry into the leniency program in the industry, has involved conspiratorial discussions among Defendants on pricing.  Chemical price increases from the major suppliers were the impetus for discussions.

57.     Defendants also undertook efforts to police the conspiracy.  Defendants followed up after discussions with competitors to see if the specific price increases and effective dates were actually being implemented

**Industry Meetings**

58.     Representatives of Defendants have regularly met through such organizations as the Polyurethane Foam Association ("PFA"), the International Sleep Products Association ("ISPA"), and Surfaces, a trade group which includes polyurethane carpet underlay producers.

59.     As previously stated, representatives from defendant companies reached agreements at these industry meetings held in the United States and abroad.

60. Representatives of defendants used these trade association meetings as nothing more than "meet-and-greet" sessions with their competitors.

61. Representatives of defendants disguised their attendance at these events as information gathering and merely used them as an opportunity to fix prices and divvy up their customers in person.

62. Representatives of defendants not only had no intention of learning about the market at these meetings, they essentially controlled the market, and attended these meetings to further demonstrate their control.

## ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

63. Plaintiff had no knowledge of the combination and conspiracy alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, prior to disclosure of Vitafoam's cooperation with the DOJ.

64. Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiffs. These violations constitute injurious acts which restart the applicable statute of limitations.

65. In addition, Defendant's and their Co-Conspirators' agreement, understanding and conspiracy in violation of the antitrust laws was kept secret. As a result, Plaintiff and the Class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for polyurethane foam throughout the United States throughout the Class Period. Defendants and their Co-Conspirators affirmatively and fraudulently concealed their unlawful conduct.

66. Plaintiff and the Class members did not discover, nor could have discovered through reasonable diligence, that defendants and their co-conspirators were violating the

antitrust laws until shortly before this litigation was initially commenced, because defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

67.     Neither Defendants nor their co-conspirators told Plaintiff or other class members that they were fixing prices and allocating customers, or engaging in the other unlawful collusive practices alleged herein.   By its very nature, Defendants' and their co-conspirators' conspiracy was inherently self-concealing.

68.     Defendants and their co-conspirators engaged in a successful price-fixing and customer allocation conspiracy, which they affirmatively concealed:

    a.  By meeting secretly (including use of private telephonic communications) to discuss prices, customers, and markets of polyurethane foam sold in the United States and elsewhere;

    b.  By agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

    c.  By using first names and initials on written communications to disguise their source;

    d.  By holding secret meetings outside and separate from the formal trade association meetings defendants were publicly attending;

    e.  By disguising price-fixing meetings and communications as technical and operational meetings;

    f.  By using fax machines at publicly available outlets to disguise the source of faxes.

## ANTITRUST INJURY

69. The unlawful contract, combination and/or conspiracy alleged above had and is having, *inter alia,* the following effects:

   a. Prices charged by Defendants and their co-conspirators to Plaintiff and members of the Class for polyurethane foam products were maintained at artificially high and supracompetitive levels;

   b. Plaintiff and members of the Class were required to pay more for polyurethane foam than they would have paid in a competitive marketplace unfettered by defendants' and their co-conspirators' collusive and unlawful price-fixing; and

   c. Plaintiff and members of the Class have been deprived of the benefits of free, open and unrestricted competition in the market for polyurethane foam.

70. During and throughout the period of the contract, combination or conspiracy alleged above, Plaintiffs and members of the Class directly purchased polyurethane foam in the United States.

71. Plaintiff and the other Class members paid more for the polyurethane foam than they would have paid under conditions of free and open competition.

72. As a direct and proximate result of the illegal combination, contract or conspiracy alleged above, Plaintiff and the members of the Class were injured and financially damaged in their businesses and property, in amounts that are not presently determined.

73. This is antitrust injury of the type that the federal laws were meant to punish and prevent.

## CLASS ACTION ALLEGATIONS

74. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the proceeding paragraphs of this Complaint.

75.     Plaintiff brings this action on behalf of itself and the members of the Class comprising:

> All persons or entities which purchased polyurethane foam directly from Defendants or their unnamed co-conspirators from January 1, 1999 to the present. Excluded from the Class are governmental entities, Defendants, their co-conspirators and their representatives, parents, subsidiaries and affiliates.

76.     Plaintiff brings this action on its own behalf and as a class action under Rule 23(a), 23(b)(2) and 23 (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the Class.

77.     Due to the nature of the trade and commerce involved, Plaintiff believes the Class numbers in the thousands, the exact number and identities being known only by Defendants.

78.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

79.     Class members are identifiable from information and records in the possession of Defendants.

80.     There are questions of law and fact common to the Class.  These common questions relate to the existence of the conspiracy alleged, and to the type and common pattern of injury sustained as a result thereof.  The questions include but are not limited to:

a.  Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize the price charged for polyurethane foam sold in the United States;

b.  The identity of participants in the conspiracy;

c.  The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in the furtherance of the conspiracy;

16

d.  Whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.  Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of plaintiff and other members of the Class;

f.  The effect of Defendants' conspiracy on the prices of polyurethane foam in the United States during the Class Period; and

g.  The appropriate measure of damages sustained by plaintiff and other members of the Class.

81.     Plaintiff is a member of the Class.  Plaintiff's claims are typical of the claims of other members of the Class, and Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff bought polyurethane foam directly from one or more of Defendants.  Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class.  In addition, Plaintiff is represented by competent counsel experienced in the prosecution of class action antitrust litigation.

82.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

83.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

84.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated

17

persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by members of the Class who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## INTERSTATE TRADE AND COMMERCE

85. The conduct of Defendants and their co-conspirators has taken place in, and affected the continuous flow of interstate trade and commerce of the United States, in that *inter alia:*

    a. Defendants and their co-conspirators have sold polyurethane foam throughout the United States;

    b. Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell polyurethane foam throughout the United States;

    c. In furtherance of the conspiracy alleged herein, defendants have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail; and

    d. The conspiracy alleged herein has affected billions of dollars of commerce. Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by plaintiff and other entities who are themselves engaged in commerce.

## CLAIM FOR RELIEF

### For Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act

86.    Plaintiff re-alleges and incorporates each and every allegation set forth above as if fully written herein.

87.    From a date unknown, but beginning at least as early as 1999 and continuing through the present, Defendants and their co-conspirators have combined, conspired and/or contracted to restrain interstate trade in violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

88.    In furtherance of the unlawful conspiracy, each of Defendants and their co-conspirators has committed overt acts, including, *inter alia:*

    a.   agreeing to charge prices at certain levels and otherwise to fix, increase, maintain and/or stabilize prices of polyurethane foam sold in the United States;

    b.   communicating with co-conspirators regarding prices to be charged for polyurethane foam;

    c.   agreeing to allocate customers;

    d.   meeting with co-conspirators in order to keep the existence of the conspiracy unknown as to foster the illegal anti-competitive conduct described herein; and

    e.   refraining from competing by refusing to offer polyurethane foam at prices below the agreed-upon fixed price.

89.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of polyurethane foam.

90.    Plaintiff and the members of the Class, therefore, have been injured and financially damaged in their respective businesses and property in an amount to be determined

according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

91.     The conduct of Defendants and their co-conspirators constitutes *a per- se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## **PETITION FOR RELIEF**

WHEREFORE, Plaintiff petitions that:

A.     The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff be appointed class representative and that Plaintiff's counsel be appointed as counsel for the Class.

B.     The contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.     Judgment be entered for Plaintiff and members of the Class against Defendants, jointly and severally, for three times the amount of damages sustained by plaintiff and the Class as allowed by law, together with the costs of the action, including reasonable attorneys' fees, pre and post judgment interest.

D.     Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

      a.     Continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

b. Communicating or causing to be communicated to any other person engaged in manufacture, distribution or sale of polyurethane foam except to the extent necessary in connection with a bona fide sales transaction between the parties to such communications.

E. Plaintiff and members of the Class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial of all issues triable by jury.

Dated: August 25, 2010

Respectfully submitted,

**THE VAN WINKLE LAW FIRM**

By: s/ Larry McDevitt
Larry S. McDevitt, NC #5032
David M. Wilkerson, NC #35742
11 North Market Street
Asheville, NC 28801
Telephone: (828) 258-2991
Fax: (828) 255-0255
Email: lmcdevitt@vwlawfirm.com
Email: dwilkerson@vwlawfirm.com

**GRANT & EISENHOFER P.A.**

Robert G. Eisler
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
Fax: (646) 722-8501
Email: reisler@gelaw.com